## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JAY D. SAMPLE, II,

      *Plaintiff*,

CASE NO. 14-cv-12747

*v.*

DISTRICT JUDGE VICTORIA A. ROBERTS
MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

      *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 18, 21)

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Sample is not disabled. Accordingly, **IT IS RECOMMENDED** that Sample's Motion for Summary Judgment (Doc. 18) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 21) be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq*. (Doc. 3; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 18, 21).

Plaintiff Jay D. Sample II was thirty-four years old when he applied for benefits on July 28, 2011. (Tr. 181). This application was denied on January 3, 2012. (Tr. 162). Sample requested a hearing before an Administrative Law Judge ("ALJ"); two such hearings occurred. The first took place before ALJ Phillip Lyman on October 18, 2012, in which Sample and medical expert Shakil Mohammed testified. (Tr. 136-161). Sample was unrepresented at the first hearing, which was adjourned so that he could obtain counsel. (*Id*.). The second hearing took place January 31, 2013 before the same ALJ. (Tr. 34-87). Sample, who was then represented by attorney John P. Miller, testified, as did vocational expert ("VE") Richard Reidl, and medical expert Robert McDevitt. (*Id*.). On February 22, 2013, the ALJ issued a written decision in which he found Sample not disabled. (Tr. 15-30). On May 13, 2014, the Appeals Council denied review. (Tr. 1-3). Sample filed for judicial review of that final decision on July 14, 2014. (Doc. 1).

**B.    Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least

twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Sample not disabled under the Act. (Tr. 30). The ALJ found at Step One that Sample had not engaged in substantial gainful activity following his alleged onset date, August 1, 2009. (Tr. 17). At Step Two, the ALJ concluded that Sample had the following severe impairments: "history of learning

4

disorder and reflux esophagitis." (*Id*.). At Step Three, the ALJ found that Sample's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 17-19). The ALJ then found that Sample had the residual functional capacity ("RFC") to perform light work, except that Sample

> is limited to less than occasional climbing of stairs/ramps. The claimant is limited to less than occasional climbing of ladders/ropes/scaffolds. The claimant is limited to frequent balancing. The claimant is limited to occasional stooping, crouching, kneeling, and crawling. The claimant will miss less than one day of work per month due to his symptoms. The claimant is limited to frequent bilateral reaching, handling, and fingering. The claimant will have very mild limits [to] speaking. The claimant is limited to occasional work at heights and with moving machinery. The claimant would have a slight limitation in understanding, remembering, and carrying out short simple instructions. The claimant would have a moderate limitation to understanding, remembering, and carrying out detailed instructions. The claimant would have a slight limitation making appropriate judgments about simple work related decisions. The claimant would have a moderate limitation interacting appropriately with the public. The claimant would have a slight limitation interacting appropriately with supervisors and co-workers. The claimant would have a slight limitation responding appropriately to work related pressures and change. Moderate means not being able to perform the function up to 10% of the day.

(Tr. 20-28). At Step Four, the ALJ found that Sample was able to perform his past relevant work as a tree trimmer as performed at the light level of exertion. (Tr. 28). Further, the ALJ determined that Sample would be able to perform work as a packager or production inspector. (Tr. 29). As a result, the ALJ found Sample not disabled under the Act. (Tr. 30).

### E.    Administrative Record

#### 1.    Medical Evidence

Psychological reports from Sample's childhood schooling reveal that he was placed in special education courses, was found to function somewhere between the first and thirty-second percentile in intellectual functioning tests, and also showed evidence of a speech impediment and some coordination issues. (Tr. 406-29).

Sample's first medical record derives from an August 11, 2009, visit to Mercy Grayling Hospital, in which he complained of abdominal pain. (Tr. 365-66). Dr. Robert Balestrero interpreted a CT scan of Sample's abdomen and pelvis as normal, showing no signs of appendicitis. (Tr. 369).

On August 24, 2009, Sample treated with Dr. Roberto Viguilla, who noted that Sample's chest pain resolved with the use of an antacid, which he used irregularly. (Tr. 337). Dr. Viguilla further noted that a CT scan of Sample's abdomen returned negative results. (*Id.*). Sample reported that he "might have been depressed most of his adult life," but had never sought treatment. Sample was found to be in no acute distress, and was "well-appearing." (*Id.*). Regarding Samples' psychological wellness, the doctor found that his judgment, insight, and memory were intact, his mood and affect appropriate, and that he was experiencing sixty-four out of eighty possible points of depression as measured on the Zung depression scale. (*Id.*). No heart, gastrointestinal, or other maladies were noted. (Tr. 338). Dr. Viguilla prescribed Wellbutrin for the treatment of depression. (*Id.*).

On September 25, 2009, Sample again visited with Dr. Viguilla for a follow-up appointment. (Tr. 339). Sample reported "doing better mood wise," and having "no trouble with Wellbutrin." (*Id.*). Again Sample's judgment, insight, memory, mood, and orientation

were found to be normal. (*Id.*). Dr. Viguilla advised Sample to continue using antacids and Wellbutrin. (*Id.*).

On June 11, 2011, Sample visited Mercy Grayling hospital complaining of rib pain without a history of injury. (Tr. 359). Dr. Todd Kennell interpreted an x-ray study of Sample's chest, and noted no abnormalities. (*Id.*).

On July 20, 2011, Sample was admitted to Mercy Grayling hospital for complaints of chest pain and bipolar disorder. (Tr. 341). Dr. Ali Wazni noted Sample's complaint that his chest pain occurred during activity or rest, and that the chest pains began while swimming; Sample stated that the pain was consistent but tolerable during his hospitalization. (Tr. 342). A cardiolite stress test revealed a "small reversible defect involving the anterior lateral wall," with ejection fraction of fifty four percent[1]; through testing Sample's heart rate was raised to eighty-two percent of the predicted heart rate. (Tr. 341, 353). A chest x-ray produced normal results. (*Id.*). On examination, Sample was found to have generally normal physical and mental status, and was specifically noted to have no hallucinations, depression, or anxiety, and had no difficulty in answering questions appropriately. (Tr. 344). Sample was then discharged to the Munson Medical Center for cardiac catheterization pursuant to his abnormal stress test results. (Tr. 341).

On July 22, 2011, Sample was admitted to the Munson Medical Center for cardiac testing. (Tr. 371). His treatment notes indicate that he admitted to occasional use of marijuana. (Tr. 374). On July 25, 2011, he underwent a left heart catheterization and coronary

---

[1] An ejection fraction greater than fifty-five percent is considered normal. *See Diamond v. Comm'r of Soc. Sec.*, 154 F. App'x 478, 480 (6th Cir. 2005).

7

angiography with Dr. Kevin Clayton, revealing "[n]ormal coronary arteries with no obstructive coronary artery disease," and "[n]ormal left ventricular function with ejection fraction of 55%." (Tr. 371). Dr. Dino Recchia made a final diagnosis of chest pain with an "abnormal stress test," bipolar affective disorder, and "[r]esting bradycardia with heart rates as low as high 30s on no rate limiting agents."[2] (*Id*.). Sample was discharged on July 25, 2011, and was prescribed the acid reducer Prilosec, for the treatment of acid reflux, and Prozac, for the treatment of depression. (*Id*.). He was advised to follow-up with his primary care provider in three weeks to ensure the efficacy of his use of Prilosec. (*Id*.).

On August 20, 2012, Sample again treated with Dr. Viguilla, who noted that Sample was "lost to [follow-up] the last 3 years." (Tr. 432). Dr. Viguilla also noted that Sample "did great" while on Wellbutrin, but that he was "ornery" when his prescription ran out and failed to acquire additional medication. (*Id*.). Sample reported to Dr. Viguilla, inconsistently with his records, that a prior catheterization of his cardiovascular system showed that his "arteries [we]re the size of a pea." (*Id*.). Sample reported no chest pain or breathing difficulties on exertion. (*Id*.). He denied the use of illegal drugs, asserted that his "regular exercise" was "work-related," and that his occupation was "tree-trimmer."[3] (Tr. 432). Dr. Viguilla noted Sample's judgment, insight, memory, and orientation were normal, but that he was experiencing depression at sixty-four out of eighty on the Zung scale. (*Id*.).

---

[2] A normal resting adult heart rate is between sixty and 100 times per minute; bradycardia is defined as a resting heart rate below sixty beats per minute. *See Plache v. Astrue*, No. 11 C 50071, 2013 WL 3389064, at *3 (N.D. Ill. July 8, 2013).

[3] Sample asserts that he last worked in 2009 (Doc. 18 at 1), yet in his 2012 treatment session with Dr. Viguilla he reported that his current exercises were "work related," suggesting that he may have continued working after 2009. (Tr. 432).

### 2.    Medical RFC Assessments

On December 12, 2011, Sample visited with Dr. A. Neil Johnson for a consultative disability evaluation. (Tr. 381-83). Sample's chief complaints at that time were "[c]hest pains, shortness of breath, bipolar, learning disability, 'Parkinson's.'" (Tr. 381). Sample noted that he experienced chest pain for about a year, but that it had been determined "that his symptoms were noncardiac." (*Id*.). Sample asserted that he used an acid reducer when eating spicy food, and doing so "was helpful," apparently in reducing his chest pain. (*Id*.). Sample revealed that he smoked up to two packs of cigarettes per day, had done so for over twenty years, and that he experienced some shortness of breath with exertion. (*Id*.). Sample also noted that he had experienced bipolar disorder since childhood. (*Id*.). Sample felt that he was "doing well," but feared that others considered him a "dickhead." (*Id*.). Sample indicated that he lived with his wife's parents, who helped to ensure he was taking his medication; failure to take his medication allegedly caused him to become cantankerous. (*Id*.). However, Dr. Johnson noted that Sample was "pleasant and cooperative" during the examination. (*Id*.). Sample attested to a history of learning disabilities, and alleged that he experienced difficulty reading a newspaper or making change; he was also unable to perform simple mathematical calculations. (*Id*.). Dr. Johnson noted that Sample "self-diagnosed" himself with Parkinson's disease because of a tremor of a "mild nature" all over his body; Sample was able to use buttons, pick up coins, eat soup with a spoon, use a hammer or electric screwdriver, and had no lifting limitations. (*Id*.). However, Sample apparently asserted that he was unable to thread a needle or use a manual screwdriver. (*Id*.). Dr. Johnson assessed that Sample could lift twenty to thirty pounds. (*Id*.).

Dr. Johnson then performed a physical examination, noting a "mild clarity of speech problem," but that he could "usually" understand him. (Tr. 382). Sample's physical examination was generally normal: he retained full use of his hands; had no difficulty getting on and off the examination table; mild difficulty with heel and toe walking; and no difficulty squatting or hopping. (*Id.*). Dr. Johnson's conclusion was that Sample suffered from "reflux esophagitis" rather than any cardiac malady; shortness of breath possibly resulting in early chronic obstructive pulmonary disease; was bipolar but "[a]s long as he takes his medication it seems to keep him under relative control;" a "significant" learning disability; and mild clarity of speech issues. (*Id.*). Dr. Johnson also "doubt[ed that] the patient has Parkinson's," but rather assessed a "mild benign essential tremor," causing "mild fine dexterity impairment." (*Id.*).

On December 23, 2011, Sample visited Dr. Michael Brady for a psychological consultative examination. (Tr. 387-90).  Sample was driven to the visit by a family member because he "does not like to drive in unfamiliar places." (Tr. 387). Dr. Brady noted that Sample had a "speech impediment and his enunciation was poor." (*Id.*). Sample complained of "cardiovascular problems, learning disabilities, and Bipolar Disorder," in addition to feelings of worthlessness, hopelessness, anhedonia, lack of concentration and motivation, sleep disturbances, and irritability. (*Id.*). Sample denied having ever been hospitalized for psychiatric reasons. (*Id.*). Sample also noted that he was last employed in 2009 as a tree cutter, but left after fifteen years of work because of "heart problems." (Tr. 388). Sample asserted that he enjoyed hunting and fishing, and that his average day included watching television, "taking care of his house and cleaning up after his dog," and cooking, responsibilities which he shared

with his wife and mother-in-law. (*Id*.). Sample denied any history of substance abuse. (Tr. 387).

Dr. Brady found that Sample's gait and posture were unremarkable, his mood depressed, hygiene good, mannerisms cooperative, and that he was ten minutes late to the appointment. (Tr. 388). Sample appeared to be in contact with reality, reported "feel[ing] ok with" himself, demonstrated no unusual motor activity or hyperactivity, and did not appear to exaggerate or minimize his symptoms. (*Id*.). Sample's stream of mental content was normal, he denied unusual thoughts or suicidal ideation, but did express "occasional feelings of worthlessness." (*Id*.). Dr. Brady then conducted a series of mental tests, showing normal orientation to time, place, and person; normal memory; a generally normal bank of information; generally normal abstract thinking; normal understanding of similarities and differences; and normal judgment. (Tr. 389). Dr. Brady noted abnormalities in terms of general knowledge and calculation tasks, found that Sample suffered from mild depressive disorder, and that he may suffer from "some cognitive defects," but that no assessments corroborated that conclusion. (Tr. 390). Dr. Brady also found that Sample's ability to interact with others was "fair," his ability to maintain concentration was "fair," his ability to understand, recall, and complete tasks was "impaired," and that his ability to withstand the stressors of a workplace was "somewhat impaired." (*Id*.). Dr. Brady assessed a GAF score of 55.[4]

### 3.    Application Reports and Administrative Hearing

### a.    Sample's Function Report

---

[4] A GAF score of 51 to 60 is indicative of an individual who has moderate symptoms or moderate difficulty in social, occupational, or school functioning. Diagnostic & Statistical Manual of Mental Disorders–Text Revision 32 (4th ed. 2000) ("DSM–IVTR").

Sample completed a function report on September 13, 2011. (Tr. 201-08). There, Sample complained that he was unable to work because he would become "out of breath a lot, dizzy & tired." (Tr. 201). He described his average day as involving watching television, eating, napping, sitting on swings, and sleeping. (Tr. 202). He reported owning a dog, but asserted that friends took care of the pet on his behalf. (*Id*.). Regarding the activities that he cannot now perform due to his ailments, Sample wrote "everything." (*Id*.). However, with regard to personal care, he reported experiencing no difficulty at all, including with dressing, bathing, or shaving. (*Id*.). He did not require reminders to perform personal care, but stated that he did need a reminder to take medicine. (*Id*.). He reported "never" preparing meals, but stated that he does perform dusting and vacuuming when told to do so. (Tr. 203). Sample reported that he could drive and leave the house without accompaniment, but went outside only "once in a while." (Tr. 204). Sample asserted that he was unable to pay bills, but could count change, handle a savings account, and use a checkbook. (*Id*.). In terms of hobbies, Sample reported "none." (Tr. 205). In terms of social activities, Sample stated that he goes "no where" on a regular basis, spends time with family "when no [sic] sleeping," and required reminders to go places, but did not require accompaniment. (*Id*.). Sample wrote "don't" in response to questions about whether and how often he shops in stores. (Tr. 204). Sample reported that he has problems getting along with others, and preferred to be by himself. (Tr. 206). Sample asserted that his lifting, squatting, bending, standing, reaching, walking, stair climbing, concentration, and ability to complete tasks were affected by his illnesses; when asked how these ailments affect him, he simply stated that he "run[s] out of breath." (*Id*.). Sample reported that he could walk about two blocks before requiring a fifteen minute rest. (*Id*.).  He could pay

12

attention for "not long," generally finished what he started, had difficulty with reading, but followed spoken instructions "ok." (*Id.*). He reported no difficulty getting along with authority figures, but said that he had been fired from prior jobs because "people pick on me [be]cause I am slow." (Tr. 207).

On September 15, 2011, Sample's mother Vickie Sample completed a third-party function report in which she generally confirmed the statements in Sample's own function report, except that she asserted that Sample shops in stores weekly. (Tr. 209-16).[5]

### b.      Sample's Testimony at the Administrative Hearing

At the January 31, 2013, hearing before the ALJ, Sample testified that he had not recently engaged in speech therapy, and that he last underwent such therapy in high school. (Tr. 52). Sample asserted that he is able to drive, but that his mind wanders after a few minutes, such that he chooses to drive only on rare occasion. (Tr. 62). Sample confirmed that he had not mentioned this symptom to any physician. (*Id.*). Sample provided short, unhelpful responses to a series of questions regarding the length of time he had experienced this symptom, why he failed to mention it to a physician, and whether he had informed the department of motor vehicles about his malady. (Tr. 63).

Regarding his depression, Sample acknowledged that he was not regularly seeing a psychological professional for treatment, and stated that his use of Prozac "didn't help" to resolve his symptoms. (Tr. 64). In describing his physical condition, Sample asserted that he has no limitations relating to his lower extremities or hands, that his hips "get sore . . . from

---

[5] Quizzically, Vickie Sample also at one point states "I am slow and couldn't work as fast as other people," apparently referring to her son in the first person. (Tr. 215).

time to time," and that he loses his breath "after a while." (Tr. 68). Regarding why he does not visit with physicians more often, Sample asserted that he does not have insurance and lacks "money to go see a doctor." (Tr. 70).

Upon examination by his attorney, Sample asserted that his depression manifests in feelings of being "messed up," a desire to self-isolate, fears that others are staring at him and making fun of him, and that he cries "all the time," at least six days per week, particularly at night. (Tr. 70-71). Sample testified that he "go[es] away from anybody else" until he calms down "[a]t least once a day." (Tr. 75). In terms of his bipolar symptoms, Sample asserted that he "can be normal one time, and then a minute later I'll just snap, and I'll start yelling at everybody." (Tr. 71). He asserted that he sometimes goaded co-workers into fights, and on other occasions he would just "walk off." (Tr. 72).

In terms of his alleged heart ailment, Sample asserted that he "can walk like two houses down, then I've got to stoop for 10 minutes, 15 minutes because I lose my breath." (Tr. 74). He described experiencing heart pains "[e]very now and then," and sometimes feels like someone is "[s]itting on my chest" such that he cannot catch his breath. (Tr. 74-75). When asked about the cause of such symptoms, Sample testified that "[a]nything can do it." (Tr. 75). The ALJ asked whether Sample used a cane, and he testified that "once in a while" he "pick[s] up a stick . . . just to help me in case I lose my balance," but said he does so infrequently because "I don't usually go nowhere." (Tr. 76). Sample claimed that his "arteries are the size of a pea." (Tr. 58). However, Sample's attorney recognized that no doctor rendered such a diagnosis, and that he was merely diagnosed with unstable angina, and that a later catheterization revealed normal results. (Tr. 59).

14

Regarding his prior work as a tree trimmer, Sample asserted that he remained on the ground and "drug brush" on behalf of other workers. (Tr. 66). Sample stated that he worked with his father as a tree-trimmer, and said that his father would "just send me on my own, and let me do my own thing," and would tell other workers not to bother him (Tr. 72-73).

### c.   McDevitt's Testimony at the Administrative Hearing

Medical expert McDevitt testified that, based upon his review of the medical records, Sample may have a combination of impairments which would render him disabled. (Tr. 46). McDevitt noted that Sample suffered from chronic depression and acid reflux, had an "abnormal stress test" in July 2011, and was "not very functional" before that test and was "less functional" thereafter. (*Id.*). He also noted Sample's "obvious [l]earning disorders" and speech disorder. (Tr. 47). McDevitt placed particular emphasis on Sample's "abnormal stress test," concluding that "[i]f you have a problem when you have a 35-year-old, even if you have a normal cath[eterization], if they've got an abnormal stress test, then the cardiologist[s] are prone to not make the same slate . . . . [H]e's got a heart problem – clear." (*Id.*). McDevitt also noted that Sample appears to receive "a good bit of support from his wife, [and] from her parents . . . so that I suspect we would have a disorder equal to that referenced in 20 C.F.R. Pt. 404, Subpt. P, App. 1 §] 12.04." (*Id.*). He also found that Sample's learning disorder would equal the impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.02. (*Id.*).

The ALJ then asked McDevitt to give specific support for his findings. (Tr. 48). McDevitt asserted that Sample's "original complaint to doctors, [that] he struggles. He has feelings of worthlessness, hopelessness, about his future, anodynia [sic], decreased concentration, decreased motivation, sleep disturbance and irritability. . . . [T]hose are clear

15

cut symptoms of depression." (*Id*.). McDevitt also stated "I would refer you to the cardiac [testing results,] even though that's not my field," but nevertheless opined that "I've done enough consultations for our cardiac service to known that this is a real conundrum when you have a younger man with an abnormal stress test, even though he has . . . been cleared through a catheterization." (*Id*.). He further asserted that such a result placed Sample into a "land of limbo," because "[n]o cardiologist is going to clear him totally with that test in the background." (Tr. 49). However, McDevitt also noted that more recent testing of Sample's heart showed "completely normal" results. (*Id*.). He further asserted that his opinion was "[m]aybe a bit obscure," but that "at least from my own practice . . . an individual like [Sample] who's already sensitized to issues like this has the perception that he still has serious cardiac disease." (Tr. 50). The ALJ noted that McDevitt appeared to be "talking about a somatoform disorder now," referring to Sample's belief that he experienced a heart disorder despite evidence to the contrary. (*Id*.). McDevitt concurred that such beliefs may be "[a] part of it," but that Sample also experienced difficulty with his "intellectual perception of the issue," and "maybe even secondary gain." (*Id*.). Expressing confusion, the ALJ inquired as to what "reasonably solid evidence" McDevitt could identify which showed that Sample met listings 12.02 and 12.04. (*Id*.). McDevitt then restated Sample's medical history, concluding that "[t]here isn't really objectively any evidence that he's dis-impaired, but I think from the subjective and from the sense – he has a sensitive impairment." (Tr. 51).

McDevitt assessed that Sample could take care of himself, that his ability to relate to others was moderate with "no real problems." (Tr. 53). McDevitt also testified that Sample was moderately limited in terms of concentration, persistence, and pace, because he "has the

16

idea or the perception that he can't do heavy physical work . . . [and] the cardiologist – may not have cleared him for that." (Tr. 53). The ALJ asked whether any doctor opined that Sample should avoid heavy lifting or physical labor; McDevitt noted that he "[did not] have the cardiologist's restrictions at all." (*Id*.). Sample's attorney noted that he was temporarily diagnosed with "unstable angina" following his abnormal stress test, but that "there's really no restrictions put on him." (*Id*.). Expressing further frustration, the ALJ asserted "I have real trouble assuming that [a temporary diagnosis of unstable angina is] a lifelong imperiling condition without some medical evidence. . . . I do not know what's going on with this man's heart." (Tr. 54). McDevitt again asserted that Sample's true issue was the "perception of his illness, which obviously is perception rather than the reality." (Tr. 55). McDevitt then asserted that "there is evidence that [Sample's] in sort of a sheltered kind of . . . living situation where his wife and his relatives and everybody is sort of taking care of him." (Tr. 57). McDevitt recognized that "the evidence is rather thin of course," and that he believed that Sample "could become more productive and more functional." (Tr. 58). However, McDevitt also found that "[r]ight now I don't think he's functional." (Tr. 60). The ALJ again asked for clarification, and McDevitt testified that his conclusion was based upon Sample's depression and his "lingering perception" of a heart disorder." (Tr. 61).

### d.      The VE's Testimony at the Administrative Hearing

The ALJ then asked the VE a series of hypothetical questions to determine whether Sample is capable of completing competitive, remunerative work. (Tr. 77). First, he asked the VE to assume a person of identical age, education, and vocational history to Sample, but who could "lift and carry . . . 20 [pounds] occasionally and 10 frequently;" who was able to stand,

17

sit, and walk for six out of eight hours; who could use ramps and stairs occasionally, ladders, scaffolds, and ropes less than occasionally; who could balance frequently; who would miss more than two days per month; who would require a one-hour unscheduled break per day; who could frequently engage in reaching, handling, and fingering; who had very mild limitations to speaking; who could be exposed to heights and machinery less than occasionally; who had slight limitations to understanding and remembering; slight limitations to carrying out instructions; moderate limitations to remembering and carrying out detailed instructions; slight limitations to making simple work related decisions; moderate limitations to interacting with the public; who was slightly limited in interacting with supervisors and co-workers; and who was slightly limited to handling work pressures. (Tr. 77-78).

The VE asserted that a person with such limitations could not perform Sample's past work as a tree trimmer. (Tr. 78). However, he also noted that there was "really no information as to how the past work was performed;" while tree trimming is generally requires a "medium level" of exertion, and the VE "suspect[ed] it was medium or even up to heavy [work] as performed." (*Id*.). The VE further stated that the absences and unscheduled breaks in the hypothetical "would not allow for full-time competitive work" in any field. (Tr. 78-79).

The ALJ then asked a second hypothetical which maintained all of the same restrictions as in the first hypothetical, but reduced the absences to once per month and apparently eliminated the unscheduled breaks and environmental restrictions. (Tr. 79). The VE testified that such a worker could still not perform competitive work. (Tr. 80). For the purpose of clarifying the scope of Sample's tree trimming work, the VE then asked Sample directly how much weight he lifted on the job. (*Id*.). Sample replied that the heaviest weight he lifted was

18

five or ten pounds, and never more than twenty pounds, and that his work was merely limited to dragging branches around on the ground, not lifting branches into a chipper. (Tr. 80-81). The VE thereupon reassessed Sample's past work, finding that it was actually performed at a "light" level of exertion. (Tr. 81). The VE then determined that the worker in hypothetical number two could perform Sample's past, light work as a tree-trimmer. (Tr. 83). However, the VE also expressed some doubt about whether the work could have actually been performed at the light level, and again opined that the work could range from medium to heavy in most cases. (*Id.*).

The VE also testified that the worker set forth in hypothetical two could complete a number of jobs in the national economy. He specifically identified light, unskilled work in the field of light packaging (6,500 jobs in the Lower Peninsula of Michigan), and production inspector (5,400 jobs). (Tr. 84-85).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's

19

impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a

treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL

21

180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

    (i)    [D]aily activities;
    (ii)   The location, duration, frequency, and intensity of . . . pain;
    (iii)  Precipitating and aggravating factors;
    (iv)  The type, dosage, effectiveness, and side effects of any medication .
           . . taken to alleviate . . . pain or other symptoms;

22

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40

(6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history

and the consistency of his or her subjective statements are also relevant. 20 C.F.R. §

404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the

groundwork for this, stating, "An individual shall not be considered to be under a disability

unless he [or she] furnishes such medical and other evidence of the existence thereof as the

Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The

RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using

"all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical

question to the VE is valid if it includes all credible limitations developed prior to Step Five.

*Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v.*

*Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G.   Analysis

Sample argues that the ALJ erred in the following ways: 1) Failing to credit McDevitt's

testimony despite his role as the only examining psychologist and the only psychologist privy

to the full records; 2) Failing to include depression and learning issues as severe impairments

at Step Two; 3) Failing to consider Sample's poverty as a reason for his failure to obtain

medical treatment; 4) Erroneously discrediting Sample's credibility based on his use of

23

marijuana; 5) Erroneously finding that Sample's prior work as a tree trimmer was performed at the light level of exertion. These arguments will be addressed in turn.

### 1.    The ALJ Did Not Err by Giving McDevitt's Testimony Very Limited Weight

First, Sample argues that the ALJ erred by giving very limited weight to the testimony of Medical Expert McDevitt. (Doc. 18 at 16-18). Recognizing that "the evidence in this case is very limited," Sample asserts that McDevitt's testimony supports the conclusion that "Plaintiff's episode with heart pain might create a psychological problem that was in effect disabling because of Plaintiff's limited intelligence." (*Id*. at 16). Sample complains that McDevitt's testimony was worthy of greater weight in part because he was the only medical expert "at trial [and] who had the opportunity to review all the records and be present during the Plaintiff's testimony," and that the ALJ erred by giving greater weight to "the opinion of a non-examining reviewer." (*Id*.). This is a creative argument, but it cannot withstand scrutiny.

The ALJ provided numerous reasons in his decision why McDevitt's testimony merited little weight, and these reasons are more than sufficient to justify the weight given. (Tr. 27-28). He noted that McDevitt appeared to base his testimony "disproportionately on subjective rather than objective considerations," substantially understated Sample's activities of daily living, and speculated about matters beyond his expertise, particularly on the issue of cardiology. (*Id*.). These assertions are well supported by the transcript. McDevitt found that Sample may be disabled by his combination of impairments, and in particular his belief that he suffers from a heart condition. (Tr. 46-58). While his testimony is somewhat unclear, McDevitt appears to have concluded that because Sample showed abnormal results on a cardiac stress test, "[n]o cardiologist is going to clear him totally," a belief which McDevitt based on "consultations" he

24

had performed for a cardiac service. (Tr. 49-50). McDevitt readily acknowledged that cardiology was "not [his] field," but stated that in his experience a "younger man with an abnormal stress test" presented "a real conundrum" because Sample was in a "land of limbo," wherein he would apparently never be certain that he was free from cardiac ailments. (*Id*.). Incongruently, McDevitt also noted that Sample suffered from diagnosed acid reflux, a medically supportable explanation for Sample's chest pain which even Sample recognized. (Tr. 46, 381). McDevitt did not explain how Sample's apparently incorrect belief that he continues to suffer from a heart disorder would impact his ability to work, nor did he explain why being "cleared" by a cardiologist would be necessary for Sample to return to work.

In his reply, Sample argues that "McDevitt was not speculating as to the extent of Plaintiff's cardiac condition . . . rather, he concluded that Plaintiff's psychiatric perception of his cardiac condition was contributing to his disabled state," and that this conclusion within McDevitt's area of expertise. (Doc. 22 at 2). However, this argument ignores that McDevitt exceeded his expertise in concluding that no cardiologist would "clear him," a matter upon which a psychologist is unqualified to opine. (Tr. 49).*Myatt v. Comm'r of Soc. Sec.*, 251 F/ App'x 332, 335 (6th Cir. 2007)(upholding ALJ's rejection of treating source opinion in part because the opinion was in an area outside the source's expertise).

Nothing in the record indicates that Sample was so obsessed with his chest pain that he would be rendered unable to work. Quite to the contrary, as the ALJ noted, Sample attested to spending his free time hunting and fishing, activities which would require a substantial amount of walking and movement. (Tr. 388). McDevitt also concluded that there was evidence that Sample was in a "sort of sheltered kind of . . . living situation where his wife and his relatives

25

and everybody is sort of taking care of him," but also noted that "the evidence is rather thin of course." (Tr. 55-57). Indeed, the only evidence that Sample lives in a sheltered environment is his testimony that his family reminds him when to take his medication and assists in performing some chores. (Tr. 202, 388). Further, McDevitt's wholesale adoption of Sample's complaints of heart problems at the hearing is rather odd given that Sample himself appears to have acknowledged that "his symptoms were noncardiac" and that use of an antacid "was helpful" in treating his chest pain during his RFC assessment with Dr. Johnson. (Tr. 381).

However, even if the Court were to ignore the supportability of McDevitt's testimony and assume that Sample will never be "cleared" of possible heart issues, there is still good reason to believe that he is not disabled by this phantom malady. The ALJ found significant gaps in Sample's credibility, which provides good reason to doubt the sincerity of his belief in his asserted heart disorder. (Tr. 22-26). Sample failed to seek treatment between September 2009 and June 2011, and when he did seek medical attention it was frequently for allegations of non-specific pain with no asserted cause and extremely conservative treatment. (Tr. 22; 26; 337; 359; 365-66). He inconsistently reported that he used and did not use marijuana. (Tr. 23, 374, 387). Sample drastically altered his asserted activities of daily living over the span of just a few months: in September 2011, Sample asserted in his function report that he relied on friends to take care of his dog, that he had no hobbies, and went "no where" on a regular basis. (Tr. 202-205). However, in December 2011, he told Dr. Brady that his activities of daily living including taking care of his dog, cooking, and cleaning the house, and that his current hobbies included hunting and fishing. (Tr. 24, 388). Sample also repeatedly asserted that his arteries were "the size of a pea" despite no medical records suggesting any such restriction of his

26

cardiovascular system. (Tr. 58, 432). Sample also reported to Dr. Viguilla excellent results from the use of Wellbutrin to treat his depression (Tr. 432) and achieved good results in reducing acid reflux with the use of an acid reducer (Tr. 381), yet did not mention the effect of these treatments during the oral hearing, and instead testified to extremely frequent and severe depression symptoms and chest pains, in contradiction to the entirety of the medical record (Tr. 70-75).

In short, McDevitt's conclusions were highly speculative and based on considerations which were entirely outside of his area of expertise. He was unable to point to substantive evidence supporting his belief that Sample was disabled through the combination of his impairments and failed to address Sample's substantial credibility issues. Even if one assumes that Sample suffers from psychosomatic chest pains, he has testified to activities of daily living inconsistent with his allegedly disabling symptoms.

## 2. *The ALJ Did Not Err by Refusing to List Depression and Speech Issues as Severe Impairments*

Sample next argues that the ALJ failed to list depression and speech issues as "severe" impairments. (Doc. 18 at 18). While Sample's argument is somewhat unclear, it appears that he is either arguing that the ALJ failed to list all of his impairments as "severe" at Step Two of the five step sequential evaluation process, or that the ALJ failed to consider these impairments in the steps thereafter, including in crafting the RFC and hypothetical questions to the VE.

The Court will first assume that Sample is attempting to argue that the ALJ failed to list depression and learning issues as "severe" impairments at Step Two. This argument is frequently raised, and just as frequently rejected, in this circuit's case law. Where an ALJ finds

27

that a claimant experiences at least one severe impairment, failure to list other impairments as severe is "legally irrelevant," because the ALJ is still obligated to consider the effects of all severe and non-severe impairments in the remaining steps of the sequential analysis. See *McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008) (quoting *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *see also Vaughan v. Comm'r of Soc. Sec.*, No. 1:13-CV-1266, 2015 WL 5691003, at *4 (W.D. Mich. Sept. 28, 2015). Because the ALJ found that Sample suffered from the severe impairments of "history of learning disorder and reflux esophagitis" at Step Two, whether he listed any other impairment as severe is legally irrelevant. (Tr. 17).

Alternately, Sample may be attempting to argue that the ALJ did not account for his depression and speech issues in crafting the RFC and hypothetical questions to the VE. Even if interpreted in this manner, Sample's argument fails. The ALJ made numerous references to Sample's speech impediment and depression throughout his decision. (Tr. 23-26). Sample points to no piece of evidence which the ALJ ignored, and his argument that the ALJ improperly weighed the evidence is limited to the flawed opinion of McDevitt, which the ALJ properly rejected for the reasons listed above. Sample did not, for instance, argue that the ALJ improperly weighed the records produced by Dr. Viguilla, which revealed moderate depression in August 2009 prior to Sample's receipt of any treatment or medication (Tr. 21, 337-38), that Sample was "doing better mood wise" and having "no trouble" with is medication by September 2009 (Tr. 22, 339), or that in August 2012 Dr. Viguilla recorded that Sample "did great" on his anti-depressant medication. (Tr. 432). Sample similarly does not take umbrage with the ALJ's assignment of "significant weight" to consultative examiner Dr. Brady's

28

December 2011 finding that Sample suffered from only "mild" depression, and his assignment of a GAF score indicative of moderate symptoms. (Tr. 24, 390).

The ALJ similarly made reference to all relevant findings regarding Sample's speech problem. The ALJ noted Dr. Johnson's conclusion that Sample had "mild clarity of speech problems" (Tr. 23, 382), and Dr. Brady's finding of a "speech impediment" with "poor" enunciation (Tr. 23, 387). However, the ALJ also acknowledged that Sample had not undergone speech therapy since high school, and was "100% understandable" at the hearing, a conclusion which is supported by the transcript of the oral hearing. (Tr. 26). Moreover, no medical professional opined that Sample's speech impediment would pose any limitation on his ability to work. As the ALJ further noted, "the claimant was able to work for many years despite his symptoms," thus his speech impediment posed no limit to his ability to work as a tree trimmer, and there is no reason to believe that his speech issues have intensified since he last performed that work.

The ALJ thus thoroughly analyzed Sample's depression and speech issues in his decision, and gave good reasons to believe that these impairments would not be disabling. Sample has not pointed to any evidence which suggests otherwise, and upon review of the record the Court finds that the ALJ's determination is well supported by the medical evidence.

### 3.    *Sample's Indigence and Failure to Seek Medical Treatment*

Sample next argues that the ALJ erred by considering his failure to seek treatment, despite Sample's assertion that he could not afford medical insurance or treatment. (Doc. 18 at 18-19). However, the Sixth Circuit has held "[t]he issue of poverty as legal justification for failure to obtain treatment does not arise unless a claimant is found to be under a disabling

29

condition." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (*citing McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990)). "[W]hen a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain." *Strong*, 88 F. App'x at 846. The only evidence that Sample's poverty prevented him from obtaining medical treatment is a single remark in the oral hearing transcript wherein Sample stated that lacked insurance and "money to go see a doctor." (Tr. 70). There is no support for this assertion in the record; at no point did any physician note that Sample's access to care was limited by his access to health insurance. On the contrary, Sample appears to have sought treatment on at least two occasions for minor physical pains, without a known cause, and which received extremely conservative treatment, thus demonstrating that he was willing to seek treatment even when none was necessary. (Tr. 359, 365-69). Sample also admitted to smoking up to two packs of cigarettes per day in addition to the use of marijuana (Tr. 374, 381). Courts in this circuit have regularly discounted claims of poverty as a justification for failing to seek treatment where claimants have admitted to the use of marijuana and cigarettes. *See*, *e.g.*, *Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 542 (6th Cir. 2014) ("Moore's testimony was further undermined by her continued purchase of cigarettes, which reached as high as three packs a day."); *Servantes v. Comm'r of Soc. Sec.*, No. 14-CV-10250, 2015 WL 870255, at *4 (E.D. Mich. Feb. 27, 2015) (noting that a claimant's use of marijuana, tobacco, and alcohol weighed against a claimant's assertion of poverty as justification for the failure to seek treatment).

30

Furthermore, the ALJ did not rely on Sample's lack of treatment as the sole reason for discounting his credibility. The Sixth Circuit has cautioned against use of such reasoning as the "determinative factor" in credibility assessments. *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). In this case, Sample's lack of treatment was only one reason among a litany of strong justifications for doubting his credibility. The ALJ also cited the conservative treatment of Sample's physical and mental impairments, the inconsistency of his testimony regarding his use of marijuana, his exaggerated claims regarding his heart issues, inconsistency between his hobbies and asserted level of limitation, among other reasons for questioning his credibility. (Tr. 24-28). The ALJ thus did not err in his discussion of Sample's spotty history of medical treatment, and did not commit reversible error by failing to discuss Sample's unsupported claim that poverty limited his access to medical care.

### 4.   *The ALJ Did Not Err by Referencing Sample's Use of Marijuana*

Sample also argues that the ALJ erred by referencing marijuana use in the course of impugning his credibility. (Doc. 18 at 19). Sample challenges "Plaintiff was less than credible by failing to mention marijuana use to a doctor on one occasion? Not only did marijuana use have nothing to do with Plaintiff's impairments, there was no evidence to show that it was a significant factor in his case." (*Id*.). Sample appears to have simply misunderstood the purpose behind the ALJ's reference to his marijuana use. The ALJ was not discrediting Sample because of a bias against illegal narcotics users, nor was the ALJ suggesting that Sample's use of marijuana somehow caused his impairments. Rather, the ALJ noted Sample's "lack of candor regarding his marijuana usage," and elsewhere in the decision noted that Sample told Dr. Brady that he "occasionally smokes marijuana," but "denied all illegal drug use" when

31

speaking to Dr. Viguilla. (Tr. 23-24, 27). The issue is thus not whether Sample engaged in smoking marijuana, but whether his testimony was credible based on inconsistent responses to different physicians. Even if we put the ALJ's reference to marijuana aside, there are numerous reasons to doubt Sample's credibility. As the ALJ noted, Sample also inconsistently reported having "no hobbies and interests" in his function report (Tr. 18, 205), and later told Dr. Brady that his hobbies included hunting and fishing (Tr. 24, 388). While the ALJ did not specifically note inconsistencies between Sample's function report and the third-party report produced by his mother, it is also noteworthy that Sample there attested to never shopping in stores (Tr. 203-04), whereas his mother reported that he shops in stores weekly (Tr. 212). Sample also asserted in his function report that he never cooks (Tr. 203), whereas he told Dr. Brady that he shares cooking responsibilities with other members of his household (Tr. 387). The record is replete with such inconsistencies, and there is simply no question that the ALJ provided adequate reasons to doubt the veracity of Sample's testimony.

### 5.   *The ALJ Did Not Err in Finding that Sample Could Return to His Past Work*

Finally, Sample asserts that the ALJ erred by finding that his past work as a tree trimmer was performed at the "light" level of exertion. (Doc. 18 at 19). Sample testified at the hearing before the ALJ that his work involved only dragging small branches overland, that he did not lift them into a wood chipper, that he usually lifted five to ten pounds, and that he never lifted more than twenty pounds. (Tr. 80-81). Sample now argues that the ALJ should have ignored this testimony because the VE asserted that "in the [Dictionary of Occupational Titles, tree trimming] is medium work," and that in the experience of the VE he "suspect[ed] at times it could be much heavier than that." (Tr. 83). Sample now questions whether "any reasonable

trier of fact [could] literally believe that he never lifted over 20 pounds in a job that involved moving logs and debris?" (Doc. 18 at 19). The Court cannot agree that Sample's testimony on this matter is so incredible or doubtful that the ALJ was not entitled to rely upon it. By Plaintiff's own admission, the work he performed as a tree-trimmer was "somewhat sheltered" because he worked for his father, "who gave Plaintiff lighter objects to carry." (*Id*.). Moreover, Sample's testimony on this issue was both lengthy and emphatic: he asserted that he did not lift the same weight as his co-workers, that he would "take smaller numbers so [he] could drag [the tree limbs], and that he usually dragged "four of five pieces of brush at a time," which were usually "around ten" pounds in weight. (Tr. 80-82).

In any case, Sample's argument regarding the weight of the brush he carried is ultimately irrelevant, because the VE found that he could also work as a light packager or production inspector. (Tr. 84-85). Thus, even if Sample is correct that he could not return to his past work, the ALJ properly determined that he was not disabled because he could perform a significant number of jobs in the national economy. *See Sanders v. Comm'r of Soc. Sec.*, 66 F. App'x 551, 554 (6th Cir. 2003); *Tracy v. Comm'r of Soc. Sec.*, No. 11-CV-15107, 2012 WL 3542477, at *16 (E.D. Mich. July 13, 2012) (finding that remand was not appropriate where an ALJ erroneously concluded that a claimant could return to his past relevant work, because the VE identified other positions which the claimant could perform). Sample does not challenge the ALJ's conclusion that he could perform work as a light packager or production inspector, thus any argument on that matter is waived. *See United States v. Ahee*, 5 F. App'x 342, 349 (6th Cir. 2001).

Having reviewed the totality of the evidence, the Court finds that the ALJ's decision is supported by substantial evidence. Sample's assertions of error are without merit, and the ALJ's interpretation of the medical findings and Sample's credibility are well supported by evidence of record. The ALJ did not err by giving little weight to McDevitt's testimony, properly considered all of Sample's severe and non-severe impairments, provided substantial reasons to doubt the credibility of Sample's statements, and properly found that Sample remains capable of performing work which exists in substantial numbers in the national economy.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Sample's Motion for Summary Judgment (Doc. 18) be **DENIED**, the Commissioner's Motion (Doc. 21) be **GRANTED**, and that this case be **AFFIRMED**.

### III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to

34

this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: October 23, 2015          S/ PATRICIA T. MORRIS
                                Patricia T. Morris
                                United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 23, 2015          By s/Kristen Krawczyk
                                Case Manager to Magistrate Judge Morris